STATE, Respondent, v. PARKER, Appellant.

*No. State 117.   Argued May 3, 1972.—Decided June 6, 1972.*
(Also reported in 197 N. W. 2d 742.)

For the appellant there was a brief and oral argument by *William M. Coffey* of Milwaukee.

For the respondent the cause was argued by *Michael R. Klos,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

HEFFERNAN, J.   On this appeal defendant's principal attack is upon a statement which he allegedly gave to

the police while being conveyed from the scene of his apprehension to the hospital. Timely motions were made, and evidence was heard, in a pretrial hearing in conformance with the standards of *Roney v. State* (1969), 44 Wis. 2d 522, 171 N. W. 2d 400. The attack upon the statement is twofold: One, that the statement should be excluded under the *Miranda* rule (*Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694) because it is contended there was not an affirmative showing that the defendant elected to give his statement with the full knowledge that he was not required to do so; and, two, that, in the totality of the circumstances, it was not proved beyond a reasonable doubt that the statement was voluntary. The trial judge denied the motion and filed a memorandum opinion in which he concluded that the statement was not excludable under the rule of *Miranda* and that the statement was voluntary.

While the burden of proof is upon the state to show beyond a reasonable doubt that statements or confessions are admissible, on review by this court the test is whether the findings by the trial court were contrary to the great weight and clear preponderance of the evidence. As alluded to in *Roney v. State, supra,* page 533, the test imposed under the exclusionary rule of *Miranda* is not identical with the test of *State ex rel. Goodchild v. Burke* (1965), 27 Wis. 2d 244, 133 N. W. 2d 753. Counsel for the defendant correctly points out, relying on *Roney,* that a statement may be involuntary although elicited in accordance with the standards required by *Miranda.* We consider the issues separately.

When the defendant was arrested, he told the officers that he had been shot. The officers initially believed that he was seriously wounded and, instead of waiting for an ambulance, he was placed on the floor of a

police wagon and rushed to the hospital. The officers testified that the journey to the hospital was at a high rate of speed, with a red light flashing and the siren operating. The trip took approximately ten minutes. Two police officers were in the rear of the wagon with the defendant.

During the course of the hearing on the motion to suppress the statement, and during trial, the defendant made grossly contradictory statements. For example, at one time he testified that he had absolutely no recollection of anything that happened from the time of his arrest until the time he got to the hospital. At another point, he stated that he was absolutely clear in his recollection of what happened. He stated that he had been beaten by a number of police officers in an effort to extort a confession. The trial judge, in making his findings of fact, disbelieved the defendant's version of the episode in the police van.

Defendant's counsel, in his statement of the facts and in oral argument, has elected to rely on the version of the incident in the wagon as related by the police officers. It is on the basis of their testimony, which counsel does not dispute on this appeal, that he urges that the statement was constitutionally inadmissible under *Miranda* and was, in any event, involuntary under the standards of *Goodchild*. The defendant is consistent throughout his testimony to the extent that he denies that he gave any statement whatsoever.

The defendant, after being placed in the police van, stated approximately 10 times, "Please don't let me die." One of the police officers stated, after first aid was administered and the defendant kept repeating, "Please don't let me die," that he said to the defendant that, if he felt he was going to die, he should tell them

what happened. The defendant commenced to tell what happened, but Officer Kliesmet advised him of his constitutional rights to remain silent under *Miranda*.

The testimony at the *Goodchild*-type hearing indicated that the police officer had fully and properly stated the *Miranda* admonitions. Defendant does not dispute the state's contention that the *Miranda* warnings were given. The thrust of the argument is directed to whether the defendant understood his rights and affirmatively waived his right to counsel before proceeding with the statement. The record admits of no doubt that the defendant understood his *Miranda* rights. Officer Kliesmet was asked whether the defendant understood these rights. Kliesmet answered, "Yes, sir, he was very clear, his eyes were clear, and he answered very distinctly." Later, on cross-examination by defendant's counsel, Kliesmet said, "He said he understood, yes." The record indicates that the defendant was twice warned of his constitutional rights. In response to Kliesmet's question whether the defendant understood them, the defendant once answered, "Yes, I do," and on another occasion he nodded his head affirmatively. The record is clear that during this entire period the defendant was conscious, that he tried on several occasions to sit up to examine his wound, and that he was coherent. As it later developed, he was not seriously wounded. Examination at the hospital showed that he had sustained a relatively minor puncture wound from a piece of glass when he attempted to run through the glass door of the tavern. The defendant himself testified that he was not confused and clearly remembered everything that happened.

We are satisfied that the record makes it abundantly clear that the defendant had the capacity to make an intelligent, knowing, and understanding waiver of his rights under the *Miranda* rule. The trial judge so found, and we are satisfied that such findings are not contrary

to the great weight and clear preponderance of the evidence. *Roney, supra,* page 534.

Counsel correctly contends, however, that the capacity to understand and even actual understanding of the *Miranda* rights is but one facet of the *Miranda* exclusionary rule. The contention is that, although those rights were explained and understood, in addition there must be an affirmative election to proceed with the statement, with the full understanding that a statement need not be given and that the defendant has the right to have a state compensated attorney present. *Miranda,* page 475, states:

"An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact *eventually* obtained. A statement we made in *Carnley v. Cochran,* 369 U. S. 506, 516 (1962), is applicable here:

" 'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.' " (Emphasis supplied.)

In the instant case the record is not silent. Unlike the situation referred to in *Miranda,* where a confession was "eventually" obtained, here the statement immediately followed a clear affirmative manifestation by the defendant that he understood his right to remain silent. These circumstances satisfy the *Miranda* rule. The defendant's conduct constituted an express waiver.

Additionally, counsel argues that the standards applied at an in-court hearing on the waiver of counsel are applicable to custodial interrogation. He cites *Mc-*

*Carthy v. United States* (1969), 394 U. S. 459, 89 Sup. Ct. 1166, 22 L. Ed. 2d 418, and contends that the *McCarthy* procedure should be applied in a case like the present one. Counsel cites no authority for his proposition and apparently asks that the *McCarthy* series of questions be superimposed by this court upon the present *Miranda* requirements. We decline to do so.

The contention is also made that, even were the requirements of *Miranda* found to have been complied with, the statement under the circumstances could not have been voluntary. Admittedly, at the time the statement was made, the defendant believed that he was near death. The record, however, shows that the officers attempted to reassure the defendant and told him that his wound was not as serious as he thought it to be.

No argument is made on this appeal that any of the alleged coercion was as the result of police conduct. Rather, it is alleged that one in the circumstances of the defendant, where he believed himself to be near death, could not give a voluntary statement that was the product of his deliberate choice. The trial court made detailed findings that the statement was voluntary and deliberate. These findings will not be upset unless they are against the great weight and clear preponderance of the evidence. The test to be applied is the "totality of the circumstances."

The record indicates that the defendant was alert and knew what he was doing. The only police conduct that can be said to have stimulated the defendant's statement was Officer Kliesmet's saying that, if the defendant thought he was going to die, he should tell what happened. He immediately began to tell what happened, and it was at that time that the valid *Miranda* warning was given. The defendant then continued with his statement, which we deem, in the totality of the cir-

cumstances, to have been voluntary. It is apparent that the motivation for the defendant's statement—his fear of death—came from his own appraisal of his situation and not from any external source. The police had earlier attempted to allay his fears. As this court said in *Krueger v. State* (1972), 53 Wis. 2d 345, 356, 192 N. W. 2d 880, citing *Phillips v. State* (1966), 29 Wis. 2d 521, 530, 139 N. W. 2d 41, "One must distinguish between motivation and a compelling overpowering mental force." The defendant's contention would lead to the conclusion that, as a matter of law, a confession made by one who thought his death imminent, although subject to no coercion, could not constitute a voluntary statement implicating him in the commission of crime. We disagree with that proposition.

The defendant on this appeal has elected to rely *in toto* upon the testimony of the police officers. There is no evidence of any coercion. Nothing the police did motivated the defendant's willingness to tell what happened. The defendant's own apprehension for his physical condition produced the statement. "The confrontation did not cause or force the defendant to make the statement. It was only the occasion." *State v. Schneidewind* (1970), 47 Wis. 2d 110, 119, 176 N. W. 2d 303.

The defendant asked that, in addition to the instruction on first-degree murder, an instruction be given, and a verdict submitted to the jury, on second-degree murder. The submission of multiple verdicts in murder cases was thoroughly discussed in *State v. Bergenthal* (1970), 47 Wis. 2d 668, 675, 178 N. W. 2d 16. The court therein stated:

"Where the defendant is able to demonstrate that there is no reasonable view of the evidence that warrants conviction on the greater offense, and the trial court agrees, there remains no issue on such charge to go to the jury. The purpose of multiple verdicts is to

cover situations where under different, but reasonable, views of the evidence there are grounds either for conviction of the greater or of the lesser offense. The lesser degree verdict is not to be submitted to the jury unless there exists reasonable grounds for conviction of the lesser offense and acquittal on the greater."

Parker does not deny being in the tavern and shooting the bartender. He denies only that he intended to kill him. The difference between second-degree and first-degree murder has been defined as "the absence of the design to effect death." *Zenou v. State* (1958), 4 Wis. 2d 655, 668, 91 N. W. 2d 208. The question, therefore, under the test explained in *Bergenthal,* is whether, under the evidence, there is a reasonable ground upon which the jury could have found that the defendant did not intend to kill Glicksman.

The defendant testified that he went into the tavern to use the men's room and not to commit a robbery. He stated that, after an exchange of words with the bartender, the bartender commenced to beat him with a stick. He claims that, in his effort to leave the tavern, the pistol, which he theretofore had in his pocket, fired twice. The defendant attempts to corroborate his story by citing evidence of a struggle. He refers to a picture showing a tall stool lying on its side, and to the fact that after the shooting, the bartender was seen picking up an ashtray from the floor and that the autopsy disclosed a small scrape on one of the legs of the deceased. It would be an unreasonable view of the evidence to conclude that, in the alleged struggle between a twenty-three-year-old six footer and an aged man, the gun should have been fired twice unless there was an intent to kill the bartender. There was no evidence that would tend to show that the firing of the gun was at extremely close range. The record fails to show any powder burns on the clothes or body of the bartender, as there would

have been if the assailant and the victim were grappling at close quarters.

The defendant, of course, argues that he did not enter the tavern with the intent to commit a robbery or any other crime. His credibility with respect to the entire incident is exceedingly dubious. He entered the tavern armed; and at least one of the witnesses stated that, when he burst from the tavern door, he was wearing a hood pulled down over his head and face. Under the circumstances, only an unreasonable view of the evidence could give credence to the defendant's version of the shooting. While there is no proof that the defendant entered the tavern with the intent to kill, "No appreciable space of time is required to elapse between the formation of the intent to kill and the act of killing in order for the homicide to be first-degree murder." *Brook v. State* (1963), 21 Wis. 2d 32, 45, 123 N. W. 2d 535.

The trial judge properly denied the submission of an instruction for a verdict of second-degree murder.

During the course of closing argument, the prosecutor attempted to bolster his position that Parker had entered the tavern with the intent to commit a robbery. He quoted from an investigative report of Police Officer Neuman. Officer Neuman investigated the shooting shortly after its occurrence. Earlier, in the course of the state's case, Larson, the theater manager, testified that Glicksman called for help and stated that he had been robbed. To impeach this statement of Larson, the defense called Officer Neuman. Officer Neuman testified that his report failed to show that Larson had told him of the robbery statement and, in addition, stated that he had no recollection that Larson made such statement. Although Officer Neuman referred to his investigative report, the report was not introduced into evidence. In the closing argument, the prosecutor re-

ferred to this unintroduced report and declared that it made references to the "robbery." An objection was promptly made to the prosecutor's statement. The trial judge sustained the objection and denied defense counsel's motion for a new trial.

It was error for the prosecutor to have called to the jury's attention evidence which had not been produced at trial. The defendant contends that the prosecutor's misuse of this evidence constituted prejudicial error requiring reversal of conviction and a new trial. We are satisfied beyond a reasonable doubt that the error was harmless. The error was promptly discovered by vigilant defense counsel and was stricken from the record. Moreover, the only effect of the forbidden evidence was an attempt to weaken the prior impeaching evidence. The crucial point as to whether Glicksman had said that there was a robbery had clearly and unequivocally been put in the record by the testimony of Larson. The point had already been established by other "substantial independent evidence" in the record as a whole. *McKinley v. State* (1967), 37 Wis. 2d 26, 40, 154 N. W. 2d 344. There was, in addition, the substantial evidence that the defendant was seen removing a ski mask as he ran away and, in fact, a ski mask was found in the street. There was substantial independent evidence from which the jury could conclude, without giving any credence whatsoever to the prosecutor's statement, that the defendant intended to commit a robbery. The remark, though it constituted error, was not prejudicial.

We are moreover satisfied that, even were there no evidence that a robbery had been attempted, the proved facts would have been sufficient to have sustained a conviction of first-degree murder. The evidence has been extensively reviewed. We are satisfied that it is sufficient to sustain the jury's verdict of first-degree murder. The test to be applied is "whether the evidence

adduced, believed and rationally considered by the jury, was sufficient to prove the defendants' guilt beyond a reasonable doubt." *Lock v. State* (1966), 31 Wis. 2d 110, 114, 142 N. W. 2d 183. The evidence was sufficient.

Nor can we agree with the defendant's contention that there should be a reversal in the interest of justice under this court's discretionary power, pursuant to sec. 251.09, Stats.

In *Commodore v. State* (1967), 33 Wis. 2d 373, 383, 147 N. W. 2d 283, we said that, for that power to be exercised, "Such grave doubt must exist regarding a defendant's guilt to induce the belief that justice has miscarried." On the basis of the record there is no grave doubt of the defendant's guilt. The defendant received a full and careful trial. He was represented by alert and highly competent counsel. The record is devoid of any errors which can be said to have prejudiced this case. He was found guilty of first-degree murder on the basis of probative and credible evidence.

*By the Court.*—Order affirmed.